271 P.2d 544]

[Civ. No. 19887.   Second Dist., Div. Three.   June 15, 1954.]

CLAXTON N. GREEN, Respondent, v. MENVEG PROP-
ERTIES, INC. (a Corporation) et al., Defendants;
CHARLES MENVEG, Appellant.

(1)

2

Action for damages for personal injuries. Judgment for plaintiff affirmed.

Halverson & Halverson and Zimmerman, Kelly & Thody for Appellant.

Ball, Hunt & Hart for Respondent.

SHINN, P. J.—Action to recover damages from personal injuries sustained by plaintiff when a defective lighting pole collapsed while he was working at the top of it. In a jury trial plaintiff had judgment for $40,000. Defendant Charles Menveg appeals.

The implied findings were that at the time of the accident defendant was the party in possession and control of the premises, plaintiff was on the premises and working on the pole as an invitee of the defendant, the pole was in a defective and dangerous condition and defendant was negligent in failing to correct, or warn plaintiff of, the condition. The factual background is involved, and must be set forth at some length.

Prior to 1946 and continuously thereafter, defendant was three-fourths owner of a small parcel of land located in Wilmington. The other one-fourth was owned by a corporation, Menveg Properties, Inc. At the time of the accident the improvements consisted of a blacktop surface, a wire fence, several poles equipped with power wires and floodlights, a small shed, and a small movable building intended to serve as an office. The lot was bordered on the west by a parcel

known as the Patton property. In 1946 the land was leased to Cornelius A. Heintz for a term of years, for use as a lumber yard. At the same time Heintz leased the Patton property for the same purpose. During the latter part of 1946 Heintz installed on the Menveg property certain poles, wires and floodlights, including the pole in question. In December, 1947, Heintz, failing in business, surrendered his lease. At the same time Charles Menveg and Menveg Properties granted a lease until December 31, 1950, to the Hardwood Mills and Lumber Company, owned by a Mr. Keslar and a Mr. Smith, and Heintz sold all his assets to Keslar and Smith, who also leased the Patton property. Thereafter Keslar and Smith erected on the Menveg property the small movable building. At a later date Keslar and Smith sublet the Menveg property to another lumber company, which failed in July or August of 1948. Keslar and Smith reentered at that time, but conducted no operations on the land. In the latter part of 1949 Keslar and Smith, having discontinued their lumber business, sold some of their equipment for a consideration of $1,600 to plaintiff's employer, Dubin, and his partner Wahnish, who planned to set up a lumber operation on the Patton property. Shortly thereafter, in November, 1949, Keslar and Smith sought to terminate their lease with the Menvegs, and entered into negotiations for that purpose. There was .evidence of an agreement under which the lease was surrendered. Toward the end of December, 1949, Dubin, having entered into possession of the Patton land, came upon the Menveg land, removed the wires and floodlights from the poles which stood there, and stored them on the Patton land. Charles Menveg learned that Dubin had removed the wires and lights. During the next few days Menveg and Dubin argued over ownership of the wires and lights. Finally Dubin agreed to replace them on the poles, and on January 30, 1950, Dubin and the plaintiff commenced to do so. After attaching lights and wires to other poles Dubin and plaintiff commenced work on the pole which fell. A flatbed truck was backed up to the pole and plaintiff ascended the pole with the aid of a ladder footed on the bed of the truck. He drew himself to the top of the pole and seated himself on the crossarm. The wires were drawn to the top of the pole and plaintiff, after securing one wire to an insulator on the crossarm, was in the act of putting tension on a second wire when the pole snapped at the base. Plaintiff was approximately 30 feet from the ground, and

his fall resulted in severe injuries. Subsequent examination of the pole revealed that a few inches below the surface of the ground it had become heavily infested with termites and fungus. It would have been a simple matter to discover this condition.

In his original complaint plaintiff joined Menveg Properties, Charles Menveg and Hardwood Mills as defendants. Before commencement of the trial he voluntarily dismissed as to Hardwood Mills, and amended his complaint by deleting an allegation that Hardwood Mills was a tenant in possession and inserting an allegation that Menveg Properties and Charles Menveg were in possession at the time of the accident. The verdict was against these defendants and the court granted Menveg Properties a judgment notwithstanding the verdict.

Defendant urges that the evidence proved, as a matter of law, that the lease to Keslar and Smith was still in force at the time of the accident, that he was not in possession or control of the premises when the accident occurred, and that he therefore did not owe to plaintiff a duty to invitees to discover and repair or warn of defects.

The evidence relating to the question of possession and control of the premises was as follows: Keslar testified that before November, 1949, he and Smith wanted to terminate their lease. They were not using the property after September, 1949. In the latter part of November, 1949, they negotiated orally with Charles Menveg; Keslar offered to pay up to the first of the year and to walk out and allow the Menvegs to take over the premises, and have the small office building. Charles agreed for his own part to take two months' rent and the office building and let Smith and Keslar out of the lease, and said that he would talk it over with Emil Menveg and let Keslar know of their decision. Keslar testified that a few days later his offer to surrender the lease was accepted over the telephone by either Charles or Emil Menveg—he believed it was Charles who telephoned him. Smith's testimony as to negotiations had with Charles Menveg was to the same effect. The two months' rent was paid. Keslar also testified that sometime in January or February he received a telephone call from the Menvegs' attorney requesting that Keslar send him a letter stating that he and Smith had disclaimed any interest in the lease, and had abandoned the premises. On April 3rd the request was repeated, and on April 6th Keslar wrote such a letter to Men-

vegs' attorney. In this letter he promised to remove a saw which remained on the premises. Charles Menveg testified to the negotiations with respect to termination of the lease but denied that he had agreed to it and Emil also denied having given his consent. The jury resolved the conflict in favor of Keslar's version of the transaction, which was sufficient to prove an offer to surrender the lease and an acceptance by the owners. It will be developed in our discussion that it is unimportant whether there was a formal surrender of the lease, accomplished by means of the oral agreement. There was sufficient evidence that Keslar and Smith surrendered, and that Charles Menveg assumed possession and control of the premises.

The next question is whether the implied finding that plaintiff was Menveg's invitee was justified. If Menveg invited Dubin to go upon the land, to replace the wires, both Dubin and the workman were invitees. The wires from the Menveg poles originated in and current was controlled from a shed on the Patton property, in which the meters and switches were located. Dubin testified that one or two days before the accident, Menveg called on him, claimed the wires were his, and demanded that they be restored within three days. Dubin claimed ownership. The next day Dubin called on Menveg at his office, said in effect that if the wires were Menveg's, he, Dubin, had been duped in his purchase of the mill and equipment, and asked to see some evidence of Menveg's ownership. He said that if it appeared that the wires belonged to Menveg he would replace them. Menveg produced a bill of sale which listed two floodlights and some wiring. Dubin had removed three or four floodlights. Dubin thought that two of the floodlights might be Menveg's and two might be his own. Menveg reiterated his demand and Dubin said that he would put them back. The next morning Menveg called on Dubin again, and again the matter was discussed. Thereafter Dubin and plaintiff set about replacing the wires and lights on the poles. Dubin further testified that he contended that he took the wires in the belief that they were his. The fact that the circuit originated in and ran from the shed on the Patton property tended to support his claim. The bills of sale issued by Keslar and Smith to Dubin enumerated various items plus "miscellaneous personal property on the Patton property; all fencing and motors in storage which belong to the said above mentioned equipment; and one white office building." There was room for an honest

difference of opinion whether the wiring and lighting which extended onto the Menveg property was intended to be included. There was sufficient evidence that plaintiff was an invitee.

The next claim of error relates to the instructions. The jury was instructed as set out below.[1] The record does not disclose at whose request this instruction was given. Defendant requested an instruction as set out below, which instruction was refused.[2] ■ Error is assigned in giving the first instruction and refusing the one that was requested. There was no error. The instruction that was given imposed upon plaintiff the burden of proving that the parties had settled and compromised their respective claims and that it would be necessary for the jury to so find in order to find that Menveg was an invitor. The instruction that was given was favorable to defendant. ■ It was not error to refuse the one that was requested. The question was whether Dubin's entry through sending plaintiff upon the property was voluntary and for purposes exclusively his own, or was at the request of Menveg for purposes of their mutual advantage.

---

[1]"Where one goes upon the premises of another and removes therefrom certain property such as wiring and lights and the person removing the same has no title thereto, then such person in law has a duty to restore the property to the owner thereof, and neither the person who wrongfully converted the property or his agent, servant or employee, when in the act of returning such property to the premises of the owner thereof, and while on such premises, has any greater rights than those of a licensee.

"Where, however, one has removed certain property from the premises of another, upon honest claim of title, whether valid or not, and thereafter his right to said property is disputed by the owner or possessor of said premises and each in good faith claims ownership of the questioned property and if thereafter the parties to the dispute settle and compromise their claims and in connection therewith the person who had removed the questioned property agrees to return and replace the same and said agreement is accepted and approved by the owner or possessor of the premises, and thereafter if the one having removed the questioned property goes upon the premises of the owner or possessor thereof for the purpose of restoring and replacing the questioned property or sends his agent, servant or employee upon said premises for said purpose so as to confer a benefit upon the owner or possessor of said premises, such person or his agent, servant or employee while on the premises to accomplish such purpose would be an invitee."

[2]"In determining whether there was a compromise of a dispute in good faith by Mr. Dubin, you are instructed that before a compromise, as the term is used in these instructions, can exist the party asserting the compromise agreement must prove that the debtor, in this case Mr. Dubin, made it clear to Mr. Menveg that acceptance of the return of the wires and lights were subject to the condition that it would be in satisfaction of claims by Mr. Menveg and Menveg Properties, Inc. against Mr. Dubin."

In order to constitute Menveg an invitor it was not necessary that Mr. Dubin should have ''made it clear to Mr. Menveg that acceptance of the return of the wires and lights were subject to the condition that it would be in satisfaction of claims by Mr. Menveg and Menveg Properties, Inc., against Mr. Dubin.'' Another instruction which the court declined to give at defendant's request related to the good faith of Dubin in removing the wires and lights. It was covered by the instructions that were given.

The jury was instructed ''One who goes upon the premises of another as a business visitor, at the express or implied invitation of the *owner* or *occupant,* and in connection with some mutual business interest with the *occupant* or with the latter's own business, is called in law an invitee.'' (Emphasis added.) Also, that one who goes upon the premises of another for purposes of his own is at most a licensee, but if the visit is related to the *occupant's* business or some matter of mutual interest an invitation to use the premises may be inferred. The duties of an invitor were stated and it was said that the *owner* or *occupant* or *one having control of the premises* is not bound to discover defects in the premises which reasonable inspection would not disclose. There was a further instruction that the *owner* having invited a workman to enter the premises is required to use reasonable care to provide a reasonably safe place in which to work; also, that one invited by the *owner* or *possessor* may be an invitee. The words ''owner,'' ''occupant,'' ''possessor'' and the phrase ''one having control of the premises'' were used interchangeably. The general tenor of the instructions was that an owner or occupant who extended an invitation to enter the premises would have the duty of ·an invitor. Defendant does not complain of any of these instructions. ▮ He requested an instruction, which the court refused, to the effect that unless he was ''in possession or occupation of said premises, to the knowledge of the plaintiff or his employer, he would have no right or authority to extend such invitation, and neither plaintiff's employer nor the plaintiff would be an invitee under the law.'' The principle attempted to be stated in this portion of the instruction was fully and more correctly explained in other instructions. Moreover, other portions of the requested instruction misstated the law with respect to defendant's duty of inspection. It was properly refused.

▮ Defendant requested and the court declined to give

an instruction reading, "Unless you find that the defendants were in possession *and* occupation of the premises, a reasonable time before the accident, I charge you that there was no duty upon the part of the defendants, or either of them to have made an inspection of the condition of the pole in question." (Emphasis added.) It was not a proper instruction. The term "a reasonable time before the accident" as used in the requested instruction conveyed no relevant meaning. Moreover, if the lessees surrendered and defendant assumed possession the latter part of November and the accident occurred the 30th of the following January the jury would have had no reason for finding that defendant did not have a reasonable time in which to discover the defect in the pole. He admitted that he made no inspection of it prior to the accident.

Although defendant insists he was not in possession, no instruction was requested as to what would constitute possession and none was given. "Possession" has many meanings. It may or may not be used to mean the same as "occupancy." Since the meaning of "possession" is not discussed by defendant we may assume the jury understood it to mean as the dictionaries state, "Fact or state of being under one's own control," which fits in with the definition given in Baldwin's Century Edition, Bouvier's Law Dictionary, page 955, "By the possession of a thing we always conceive the condition in which not only one's own dealing with the thing is physically possible, but every other person's dealing with it is capable of being excluded." See also Tiffany Real Property, 3d ed., volume 1, page 27. ▮ Furthermore, if an owner invites someone to go upon his land the fact that he may not then be in actual occupancy of the land would not absolve him of the duties of an invitor. If he extends the invitation he asserts his right to extend it, and, especially if it is known to the invitee that no one else is in possession or claiming the right to possession, the invitation may be relied upon by the invitee.

The case was tried upon the theory that if Keslar and Smith surrendered their leasehold interest and the surrender was accepted by defendant, possession and control passed to the defendant without regard to the physical occupancy of the premises. We have seen that the implied finding that Keslar and Smith surrendered all their rights under the lease pursuant to an agreement with Menveg, and that the latter assumed exclusive control of the property, had support in

the evidence. Moreover, in dealing with Dubin, Menveg as the principal owner, was asserting control of the premises and could not be heard to say that he was doing so wrongfully and that possession or control still remained in his lessees. There was no question of the sufficiency of the oral agreement of surrender as between Menveg and his lessees. It was sufficient to allow Menveg to take possession and it is immaterial whether he might still have had some claim against his lessees for rent until the lease was surrendered in writing. It was not error to refuse the instruction.

Defendant offered in evidence certain sections of the Los Angeles City Electrical Code.[3] In his brief, without quoting from the code, he says: "The Municipal Electrical Code prohibits every person from installing, altering, reconstructing or repairing any wiring without a license and permit and makes any violation thereof a misdemeanor."

The "owner" provision has no application. Division 70 regulates the registration of electrical contractors, prescribes qualifications and imposes certain conditions for the issuance of a certificate of registration and it provides that no person shall carry on the business of electrical contracting or install, alter or repair any electrical wiring unless he holds a certificate of registration.

Defendant says "violation of this ordinance was the proximate cause of the injury," and certain cases are cited in support of the statement. ▮▮▮ Defendant does not mention subdivision (b) of section 93.35 which provides that no person shall cause or permit to be done any work for which a permit is required unless a permit has been issued. Defendant ignores this provision, and does not discuss the question whether it was the duty of himself and Dubin, as well as the duty of Green, to obtain a permit for the work. Menveg, as one of the owners of the property, had a duty to comply with the requirements of the code. Both he and Dubin caused and permitted work to be done which under the Municipal Code could only be done by a registered electrical contractor. Defendant could not shift the duty of

---

[3] "Sec. 93.35. (a) No person shall do, install, alter, reconstruct or repair any electric wiring without a permit therefor from the Board.

"(b) No person shall cause or permit any electric wiring to be done, installed, altered, reconstructed or repaired unless a permit therefor has first been obtained from the Board. . . .

"Sec. 93.36.1. (c) No permit shall be issued to any person except one who holds a valid, unsuspended, unrevoked and unexpired certificate of registration to do electric wiring when required by Division 70, or to an owner as provided in Section 93.39; . . ."

compliance with the code to either Dubin or Green. (*Finnegan* v. *Royal Realty Co.*, 35 Cal.2d 409 [218 P.2d 17]; *Bickham* v. *Southern Cal. Edison Co.*, 120 Cal.App.2d 815 [263 P.2d 32].) Since defendant does not discuss the question of his duty under the code we shall say only that if both he and Green failed to comply with the code he is not in a position to say that it was Green's violation and not his own that was a proximate cause of the accident. This would seem to furnish an answer to the contention that it was error to exclude the offered sections of the code, but since this point has not been considered by defendant we shall discuss another reason for rejection of the evidence.

■ Proof of violation of a law does not establish actionable negligence unless there exists a causal connection between the violation and the act which causes injury, or, as some courts express it, unless there exists reasonable grounds for a belief that the violation was a proximate cause of the accident or injury. (*Page* v. *Mayors*, 191 Cal. 263 [216 P. 31]; *Shimoda* v. *Bundy*, 24 Cal.App. 675 [142 P. 109]; *Roos* v. *Loeser*, 41 Cal.App. 782 [183 P. 204]; *Blodgett* v. *B. H. Dyas Co.*, 4 Cal.2d 511 [50 P.2d 801]; *Moon* v. *Payne*, 97 Cal.App.2d 717 [218 P.2d 550]; *Knowles* v. *Roberts-at-the-Beach Co.*, 115 Cal.App.2d 196 [251 P.2d 389].)

*Cragg* v. *Los Angeles Trust Co.*, 154 Cal. 663 [98 P. 1063, 16 Ann.Cas. 1061] and *Finnegan* v. *Royal Realty Co.*, 35 Cal.2d 409, *supra*, which defendant says are directly in point, were cases in which there was a clear connection between the violation of the ordinance and the injury. In the Cragg case the negligence consisted of the employment of an inexperienced and unlicensed elevator operator without investigation as to his competency. In the Finnegan case there was reason to believe that a door which opened inward instead of outward, as required by the ordinance, was a proximate cause of plaintiff's inability to escape more quickly from a fire.

■ Defendant has not pointed out any connection between the failure to have a permit for the work, or the failure of Green to be registered, and plaintiff's accident. The sections of the code were not admissible unless there was reason to believe that compliance with the requirements would have prevented the accident or rendered it less likely to occur. If no such reason existed there was no causal connection between the failure to comply and the falling of the pole. A rotten pole is as apt to fall with a registered electrician working under a permit as with one who is unregistered

and holds no permit. ▮▮▮ The purpose of the code is to insure proper performance of electrical work in order that property owners be not defrauded, and that the public safety be preserved. It was the duty of defendant to make reasonable inspection of the pole; it was not the duty of Green to inspect it for latent defects. The provisions of the code sought to be introduced did not relieve Menveg of that duty nor impose it upon Green. ▮▮▮ There is no reason to believe that there would have been less likelihood of an accident if Green had been a registered electrician and a permit had been issued. A finding of contributory negligence on the part of Green, or of negligence on the part of Menveg, based upon nonobservance of the code, would have been unwarranted. It was not error to exclude the offered evidence.

Defendant contends that the complaint failed to state a cause of action. The argument is based on alleged defects in the complaint as first amended, which omitted a direct allegation that defendant was in possession of the premises at the time of the accident, and included an allegation that a lessee was in possession. Defendant overlooks the amendment made before trial which supplied the missing allegation of his possession and deleted an allegation that a lessee was in possession. The complaint stated a good cause of action.

Defendant also contends that the court erred in refusing to grant a nonsuit on his motion made at the close of plaintiff's opening statement. Defendant refers to only a part of the opening statement and has reproduced this material in his brief. We have read the remainder. The complete opening statement was clearly sufficient as a statement of facts proposed to be proved which would entitle plaintiff to a verdict.

The judgment is affirmed.

Wood (Parker), J., concurred.

A petition for a rehearing was denied July 6, 1954, and appellant's petition for a hearing by the Supreme Court was denied August 10, 1954.