[Civ. No. 12325. Third Dist. May 20, 1970.]

ZELDA J. LOW, Plaintiff and Respondent, v.
CITY OF SACRAMENTO et al., Defendants and Appellants.

## COUNSEL

Fitzwilliam, Memering, Stumbos & DeMers, Theodore D. Bolling, Hardy, Erich & Brown and Cavan Hardy for Defendants and Appellants.

Friedman & Collard and Morton Friedman for Plaintiff and Respondent.

## OPINION

**FRIEDMAN, Acting P. J.**—Plaintiff sustained personal injuries when she fell into a water-filled depression in a parking strip outside the Sacramento Medical Center, a hospital owned and operated by the County of Sacramento. She brought suit against the county and against the City of Sacramento as well. The trial court ruled as a matter of law that the parking strip was owned by the city and controlled by the county. It instructed the jury to that effect. A verdict and judgment were entered against both defendants. Each appeals. The city seeks affirmance of the judgment, the county reversal.

Government Code section 835 establishes the conditions under which a public entity is liable for the dangerous condition of its property. Government Code, section 830, subdivision (c), declares: " 'Property of a public entity' and 'public property' mean real or personal property owned or controlled by the public entity, but do not include easements, encroachments and other property that are located on the property of the public entity but are not owned or controlled by the public entity."

The trial court premised its declaration of concurrent responsibility upon the view that the city *owned* the parking strip as owner of the street ease-

ment within which the strip was located; while the county, as owner of the abutting hospital property, *controlled* it. On appeal the city supports the trial court's ruling. The county rejects it, urging that it neither owned nor controlled the parking strip.

The hospital property fronts on the east side of Stockton Boulevard in Sacramento. When the county acquired the property in 1869, it was situated in the unincorporated area. At that time the street in front of the property was a county road. The 1869 deed conveyed fee title to the county out to the center of the road. In 1911 the neighborhood was annexed to the City of Sacramento, and Stockton Boulevard became a city street. The city installed pavement, curbs and sidewalks in 1922. Stockton Boulevard became part of the state highway system in 1933 but in 1939 reverted to its former status as a city street.

The street occupies an 80-foot right of way, measured from the easterly edge of the sidewalk bordering the hospital grounds to the westerly edge of the opposite sidewalk. In this area the right of way is occupied, first, by a six-foot paved sidewalk; next, a six-foot parking strip or planting strip; then a rolled, as distinguished from vertical, curb; finally, the central portion reserved for automobile traffic.

Grass was planted on the parking strip. Until 1962 or 1963, county workers mowed and watered the strip, removed debris and filled any holes which developed. A problem arose. Drivers parking on Stockton Boulevard to visit the hospital would drive their automobiles over the rolled curb, permitting their wheels to rest on the parking strip. The strip became unsightly. Mowing the lawn became a difficult problem. The county asked the city to prohibit parking along the hospital frontage, but the city declined. The county suggested the possibility of paving the parking strip but without success. The county then reduced its maintenance activities, ceasing to water the lawn. As the grass died and bare dirt appeared, ruts and holes developed. Automobiles continued to roll over the curb onto the strip, creating more indentations. Each spring the county's ground crew filled in the holes but took no such action during the rainy winter weather. The county work crew continued to mow what grass was left in the strip and kept it clear of debris.

According to undisputed evidence, Sacramento property owners, not the municipality, maintain parking strips in front of their individual parcels.

On a February evening plaintiff parked her automobile in front of the hospital, intending to visit her husband, a patient in the hospital. She stepped from her car into a two-inch deep rut or hole filled with water, slipped to the ground and suffered injuries.

■ The appeal turns on the phrase "owned or controlled" in subdivision (c) of section 830. The phrase has not received judicial interpretation since its enactment as part of the California Tort Claims Act of 1963. (See, however, *Hoover* v. *City of Fresno* (1969) 272 Cal.App.2d 7 [77 Cal.Rptr. 146]; *Holmes* v. *City of Oakland* (1968) 260 Cal.App.2d 378 [67 Cal.Rptr. 197].) It is deceptively simple. It reveals ambiguity when ownership is separated from control; when the aggregation of powers called ownership is divided and when various kinds of control are held in separate hands. ■ Subdivision (c) explicitly forecloses liability where the public entity has given up an easement which it does not own or control. Even at that point, the entity, as holder of the servient estate, may retain enough control, that is, such kinds of control, as to share liability with the owner of the dominant estate. (See, e.g., *Holmes* v. *City of Oakland, supra;* cf. *Whalen* v. *Ruiz* (1953) 40 Cal.2d 294 [253 P.2d 457].)

■ Government tort liability in California is entirely statutory. (Gov. Code, § 815, subd. (a); California Government Tort Liability (Cont. Ed. Bar 1964) p. 124.) Documentary aids to the interpretation of the California Tort Claims Act of 1963 are available, namely, the Recommendation Relating to Sovereign Immunity issued by the California Law Revision Commission and the Legislative Committee Comments accompanying the 1963 legislation. (Cont. Ed. Bar, *op. cit.,* pp. 120-123.) The documentary material accompanying Government Code section 830 does not discuss the phrase "owned or controlled" but deals only with the express exclusion of noncontrolled easements over public property. (See comment of Law Revision Commission following § 830 in annotated codes; Cont. Ed. Bar, *op. cit.,* pp. 545-548.) The exclusive sway of statutory rules does not foreclose the aid of common law tort doctrines and analogies in ascertaining and achieving imperfectly expressed statutory objectives. (See *Sanders* v. *County of Yuba* (1967) 247 Cal.App.2d 748, 751 [55 Cal.Rptr. 852].) The appropriateness of that aid is emphasized by the provision of the Tort Claims Act declaring the public entity's entitlement to any defense available to a private defendant. (Gov. Code, § 815, subd. (b).)

■ In common law parlance, the possessor of land is the party bearing responsibility for its safe condition. Possession, in turn, is equated with occupancy plus control. (*Green* v. *Menveg Properties, Inc.* (1954) 126 Cal.App.2d 1, 9 [271 P.2d 544]; Rest. 2d Torts, § 328E.) Thus, in identifying the party vulnerable to a verdict, control dominates over title. "The crucial element is control." (*Schwartz* v. *Helms Bakery Ltd.* (1967) 67 Cal.2d 232, 239 [60 Cal.Rptr. 510, 430 P.2d 68].)

Interpretive aid may be drawn from the landlord and tenant cases, which are frequently characterized by division of ownership and control.

Generally, the tenant rather than the landlord controls the leased portion of the premises and is liable to third persons injured by their dangerous condition. (*Schwerdtfeger* v. *State of California* (1957) 148 Cal.App.2d 335, 345 [306 P.2d 960]; *Pfingst* v. *Mayer* (1949) 93 Cal.App.2d 265, 272-273 [208 P.2d 1002]; Prosser on Torts (3d ed.) (1964) p. 412.) The landlord is liable for the condition of areas over which he retains control, such as common passageways. (*Johnston* v. *De La Guerra Properties, Inc.* (1946) 28 Cal.2d 394, 399 [170 P.2d 5]; Prosser, *op. cit.,* p. 418.) A tenant may be liable for an area outside the strict limits of his own tenancy if he assumes control over it. (*Johnston* v. *De La Guerra Properties, Inc., supra,* 28 Cal.2d at p. 401.) In appropriate circumstances the possessor of control and a third party who created or contributed to the dangerous condition may be concurrently liable. (See, e.g., *Yee Chuck* v. *Board of Trustees* (1960) 179 Cal.App.2d 405, 411 [3 Cal.Rptr. 825]; *Schwerdtfeger* v. *State of California, supra,* 148 Cal.App.2d at p. 345.)

Cases decided under the superseded Public Liability Act of 1923 provide interpretive aid. (*Hibbs* v. *Los Angeles County Flood Control Dist.* (1967) 252 Cal.App.2d 166, 171 [60 Cal.Rptr. 364].) In express terms, that act imposed liability upon the governmental entity having authority to remedy the dangerous condition. (Former Gov. Code, § 53051, added by Stats. 1949, ch. 81, and repealed in 1963; *Gillespie* v. *City of Los Angeles* (1950) 36 Cal.2d 553, 556 [225 P.2d 522].) Although authority to remedy the dangerous condition is no longer an express statutory standard, the courts have continued to resort to it. Where control, rather than power to correct the defective condition, is the verbal signal of liability, the courts have continued to equate the two concepts. (*Avey* v. *County of Santa Clara* (1968) 257 Cal.App.2d 708, 712 [65 Cal.Rptr. 181]; *Larson* v. *Santa Clara Valley Conservation Dist.* (1963) 218 Cal.App.2d 515, 523-524 [32 Cal.Rptr. 875, 8 A.L.R.3d 665]; *Schwerdtfeger* v. *State of California, supra,* 148 Cal.App.2d at p. 345.) Thus, in identifying the defendant with whom control resides, location of the power to correct the dangerous condition is an aid.

█ The county relies heavily upon sidewalk accident decisions. The general rule views the sidewalk as part of the street; it absolves the abutting owner and holds the city liable for pedestrian injuries caused by the dangerous condition of the sidewalk.[1] The abutting owner incurs liability only when the accident results from a defect caused by him or from some condi-

---

[1]Streets and Highways Code section 5600 defines "sidewalk" to include the parking strip, while section 5610 requires the abutting owner to keep the sidewalk in safe condition. Such statutes are not designed as declarations of tort liability, but are aimed to fix financial responsibility for repairs as between the public entity and an abutting owner. (*Schaefer* v. *Lenahan* (1944) 63 Cal.App.2d 324, 327 [146 P.2d 929].)

tion or feature of the sidewalk altered or constructed for the benefit of his property. (*Kopfinger* v. *Grand Central Public Market* (1964) 60 Cal.2d 852, 858-860 [37 Cal.Rptr. 65, 399 P.2d 529]; *Sexton* v. *Brooks* (1952) 39 Cal.2d 153, 157 [245 P.2d 496].) ■ The city and the landowner may be joint or concurrent tortfeasors and may incur joint liability. (*Peters* v. *City & County of San Francisco* (1953) 41 Cal.2d 419, 429 [260 P.2d 65].) Here too, control is more important than title in pointing the finger of liability.

The analogy between sidewalk and parking strip is only partial. The former is designed primarily for public traffic, while the grassy strip between the sidewalk and curb is not. Nevertheless, the latter's use by pedestrians is expectable and normal. Decisions in other states justify the generalization that when a private owner maintains the grassy parking strip between the sidewalk and street curb, he exercises control over it, subordinate only to the municipality's street easement; thus, that the owner is liable when his failure to maintain it in reasonably safe condition causes injury to a pedestrian. (Note, Liability for injury on parking or strip between sidewalk and curb, 19 A.L.R.2d 1053, 1075-1080.) The municipal street agency bears a similar liability. Since the parking strip lies within the street right of way, the public easement enables the city to control it in the interest of public safety. Hence, the city too incurs liability for unreasonably dangerous conditions within the parking strip. (19 A.L.R.2d at pp. 1057-1064.)

Research discloses only two California cases dealing with public liability for pedestrian injuries on parking strips. *Christy* v. *City of Alhambra* (1935) 9 Cal.App.2d 499 [50 P.2d 454], is not helpful because there the municipality's liability was based not upon the dangerous condition of the parking strip itself, but upon the condition of a water meter located there. *Castro* v. *Sutter Creek Union High School Dist.* (1938) 25 Cal.App.2d 372 [77 P.2d 509], held the district liable for injury caused by the unguarded hole in the parking strip fronting on school property, but did not discuss ownership or control as factors of liability. ■ Although direct California precedents are lacking, the liability of a private abutting owner for parking strip defects is consistent with the California doctrine which requires an invitor to warn of a condition on a public street or sidewalk adjoining his business which, because of the invitor's special benefit or use, creates a danger to his invitees. (*Schwartz* v. *Helms Bakery Ltd.*, *supra*, 67 Cal.2d at pp. 239-240; see also *Ross* v. *Kirby* (1967) 251 Cal.App.2d 267 [59 Cal.Rptr. 601].)

■ These decisional analogies shed light on the phrase "owned or controlled" in subdivision (c) of section 830. Where the public entity's relationship to the dangerous property is not clear, aid may be sought by inquiring whether the particular defendant had control, in the sense of power to

prevent, remedy or guard against the dangerous condition; whether his ownership is a naked title or whether it is coupled with control; and whether a private defendant, having a similar relationship to the property, would be responsible for its safe condition.

■ In this case each defendant had a species of ownership in the parking strip—the city as holder of the street easment and the county as holder of the underlying fee.[2] ■ More important, each had control—the city as holder of the public easement and the county as abutting owner. Like a private abutting owner, the county undertook to maintain the grassy surface of the parking strip. In this activity it was subject only to the exercise of the citys' control as owner of the public street easement. The county permitted the parking strip to deteriorate. It had the power of control both to prevent its deterioration and to remedy it. Although subdivision (c) of section 830 forecloses liability where the public entity has surrendered control to an easement holder, here the county retained control, in the sense that it retained power to prevent or remedy the danger. (Cf. *Holmes* v. *City of Oakland, supra,* 260 Cal.App.2d 378.) Coupled with its ownership of the underlying fee was a set of powers amounting to "control" in the statutory sense.

■ At oral argument counsel for the county contended that the evidence regarding control was in dispute, hence that the trial court erred in disposing of the question as one of law. Although the testimony of the county and city officials was not entirely consistent, these witnesses were simply attempting to express their own legal characterizations. The facts giving rise to these characterizations were undisputed. The jury could draw but one conclusion, that is, that both defendants were vulnerable to a damage verdict; thus the question was one of law for the court. (*Smith* v. *American Surety Co.* (1957) 148 Cal.App.2d 131, 134 [306 P.2d 489].)

Judgment affirmed.

---

[2]Contrary to the county's contention, the 1911 annexation to the City of Sacramento did not operate to transfer to the city the underlying fee of Stockton Boulevard which the county had acquired by the 1869 deed. At this point the county relies on Streets and Highways Code section 989, which declares that when territory is annexed to a city, the county's interest in any county highway, "including the underlying fee where owned by the county," shall vest in the city. The statutory conveyance applies to the county in its capacity as a highway agency, not as the proprietary owner of abutting land held for governmental purposes. The annexation of 1911 did not divest the County of Sacramento of the underlying fee out to the center of Stockton Boulevard.

In the interests of justice all costs of appeal shall be borne by the County of Sacramento.

Regan, J., and Janes, J., concurred.