[No. G012612. Fourth Dist., Div. Three. Feb. 23, 1994.]

CURTIS SWANN, Plaintiff and Appellant, v.
PAUL OLIVIER et al., Defendants and Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I of the Discussion.

**COUNSEL**

Robert J. Filippi for Plaintiff and Appellant.

Nyman, Johnson, Maguire & Dyer, Thomas G. Chambers, Smith, Smith & Kring and Russell R. Arens for Defendants and Respondents.

## OPINION

**SILLS, P. J.**—The hazards that lurk beneath the surface of the Pacific Ocean just offshore from the private beach owned by the Cyprus Shore Community Association in San Clemente include riptides, submerged rocks and a hazardous drop-off. A friend of a guest at a beach party was badly injured in that surf, and brought this lawsuit against the association and the homeowner who allowed the beach party to take place, charging them with failing to warn him of these hazards.[1]

We affirm the summary judgment in favor of the association. The owners of a private beach do not own or control the ocean, and they are not responsible for injuries that take place in that ocean. "A defendant cannot be held liable for the defective or dangerous condition of property which it did not own, possess, or control." (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 134 [211 Cal.Rptr. 356, 695 P.2d 653].)

### FACTS

The Cyprus Shore Community Association owns a stretch of beach in San Clemente and allows members of certain residential communities along the beach to use it. One of these communities is Cypress Pointe. Paul and Madeline Olivier are members of Cypress Pointe. Sometime in July 1990 Paul Olivier invited an acquaintance, Julie Beauchat, to use the private beach facilities for a birthday party she was giving.

Julie invited all the guests, and the group met first at her brother-in-law's house in the morning. Curtis Swann was not among the invited guests, nor was he present at this time. Julie did not know Swann, but he was a friend of another guest and arrived later offering to drive two of the girls present to the beach party. Julie and the other adults were uncomfortable with this suggestion, and instead included him with the others in the van which they rode to the beach in.

---

[1]Cyprus Shore claims to have installed six large signs on four-by-four posts along the beach, which read: "No lifeguard on duty use beach at own risk dangerous rip tides, submerged rocks and severe drop-off make swimming hazardous. C.S.C.A. [Cyprus Shore Community Association] assumes no responsibility for injuries suffered by beach users." Because this case comes to us after a grant of summary judgment and the plaintiff claims not to have seen any signs when he walked onto the beach, we assume there were no signs for purposes of our review.

Madeline Olivier escorted the group down to the beach. Later that day Swann was injured. As we explain in detail in the unpublished portion of our opinion, Swann has admitted that he was injured in the "surf" of the public ocean, seaward of the mean high tide line that marks the border of Cyprus Shore's private property. (See Civ. Code, § 830 [property bordering on tidewater only extends to "ordinary high-water mark"].)

There is a provision in Cyprus Shore's rules and regulations which cautions residents and guests that there is no lifeguard on duty at Cyprus Shore and "swimming" is thus "at [their] own risk." The rules and regulations also mention that parents should watch children carefully because at "certain times of the year rip currents occur along the beach."

DISCUSSION

I*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II

*Charpentier* v. *Von Geldern* (1987) 191 Cal.App.3d 101 [236 Cal.Rptr. 233] presents facts superficially similar to the one at bar. In *Charpentier*, the defendant owned 51 acres of property "*bordering* the Feather River." (*Id.* at p. 105, italics added.) The plaintiff "trespassed upon the land in pursuit of a recreational purpose—swimming and diving in the river." (*Id.* at p. 111.) After first testing the waters, plaintiff climbed onto the bank, and "from the bank" dove into the river and injured himself when he hit something which resembled a sandbar. He later sued the landowner for "maliciously" failing to warn against the dangerous conditions of the Feather River. (*Id.* at p. 106.)

The Court of Appeal affirmed a summary judgment in favor of the landowner, holding that Civil Code section 846[3] immunized her from liability. Section 846 addresses the liability of landowners for the recreational use of their land by others. (See generally, *Charpentier* v. *Von Geldern*, *supra*, 191 Cal.App.3d at p. 108.) The statute first creates an immunity by providing that a landowner "owes no duty of care to keep the premises safe for entry or use by others . . . or to give any warning of hazardous conditions . . . on such premises." However, the statute then revokes the immunity in

---

*See footnote, *ante*, page 1324.

[3]All further statutory references are to the Civil Code unless specifically noted otherwise.

the case of "any persons who are expressly invited rather than merely permitted to come upon the premises by the landowner." Because the plaintiff was a *trespasser*, the court in *Charpentier* reasoned that the landowner was entitled to the immunity. (*Id.* at p. 111.)[4]

Possibly because defendants were seduced by the similarities between this case and *Charpentier* (both involve injuries in public water, access to which was through private land), the focus of their summary judgment motion was the immunity conferred by section 846.[5] As the parties framed the motion here, application of the immunity inversely depends on whether Swann was "expressly invited" onto the premises. Hence the basis of trial court's summary judgment was Swann's status as a *non*invitee.

We are not bound, however, by the trial court's stated reasons for granting summary judgment. "We review the ruling, not [the trial court's] rationale." (*California Aviation, Inc.* v. *Leeds* (1991) 233 Cal.App.3d 724, 731 [284 Cal.Rptr. 687].) Here, while we affirm the ruling, there are two reasons why we do not rely on the rationale.[6]

---

[4]This is the part of the *Charpentier* court's holding that is arguably relevant to the instant case. Most of *Charpentier*'s intellectual firepower, however, was focused on a problem of absolutely no relevance here: how the right of the public to the unimpeded use of navigable waterways (the "public trust doctrine") affects the statutory immunity conferred by section 846. A previous case decided by the same court, *Pacific Gas & Electric* v. *Superior Court* (1983) 145 Cal.App.3d 253 [193 Cal.Rptr. 336], overruled in part, *Hubbard* v. *Brown* (1990) 50 Cal.3d 189, 197 [266 Cal.Rptr. 491, 785 P.2d 1183], had held that the doctrine affirmatively defeated section 846 immunity in a case where the defendant had impeded the progress of a boat with a mast by suspending power lines across a river, and much of *Charpentier* was taken up distinguishing *Pacific Gas*. *Charpentier* thus also held that because the defendant had not obstructed or impeded plaintiff's use of the river, the public trust doctrine did not affect the statutory immunity afforded her under section 846.

[5]In *Charpentier* the court did not address the fact that the hazardous condition was actually not on the landowner's property—which only bordered the Feather River—but in the Feather River itself. Section 846, on the other hand, refers to the landowner's "premises," not *adjacent* premises. Perhaps the *Charpentier* court considered the distinction too metaphysical in the context of a dive *from* private land *into* a publicly owned body of water. The injury was merely the end point of a continuous arc that began on private property. Or perhaps the court considered the distinction irrelevant given the fact that one of the *uses* of the private river bank was as a diving platform into the public river, and "use" is clearly mentioned in section 846. In any event, neither basis for ignoring the distinction is applicable in the present case. Swann did not *commence* a dive into a public river *from* a private bank, nor did he "use" the private beach as a platform for a disastrous dive. While the record is not precisely clear exactly how Swann was injured, it is clear that he was *already* in the public "surf" when the injury occurred.

[6]We have, of course, afforded the parties the opportunity to present their views in supplemental briefing on the rationale which we *do* adopt. (See Gov. Code, § 68081.)

First, the principle of Occam's razor—that the simplest of competing theories should be preferred over more complex and subtle ones[7]—is as valid juridically as it is scientifically. In this case the principle favors resolution along the relatively straightforward lines of where the injury took place and whether the defendants had any duty to warn of hazards *in that area* rather than the factually and legally subtle problem of whether the friend of a friend of a friend who shows up at a party on one's property has really been "invited" there.

Second, the question of whether a landowner has a duty of care to any given individual logically precedes the question of whether that individual comes within an exception to a statutory immunity the landowner might otherwise enjoy. "Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity." (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 201-202 [185 Cal.Rptr. 252, 649 P.2d 894].) As Justice Crosby noted in his concurring opinion in *Rombalski* v. *City of Laguna Beach* (1989) 213 Cal.App.3d 842, 859 [261 Cal.Rptr. 820], " '. . . the immunity cart [should not be] placed before the duty horse.' " Or, in very simple terms, one should begin at the beginning.

We therefore do not reach the question of whether Swann was an "invitee" for purposes of section 846, or indeed, whether section 846 applies in this case at all. Our focus is on more basic principles.

Our starting point is the commonsense rule that one generally cannot be liable, as a landowner, for injuries that occur on property outside one's ownership, possession or control. (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at p. 134 [see quotation, *ante,* at p. 1326]; *Seaber* v. *Hotel Del Coronado* (1991) 1 Cal.App.4th 481, 487 [2 Cal.Rptr.2d 405] [" 'In premises liability cases, summary judgment may properly be granted where a defendant unequivocally establishes its lack of ownership, possession, or control of the property alleged to be in a dangerous or defective condition' "]; *Gray* v. *America West Airlines, Inc.* (1989) 209 Cal.App.3d 76, 81

---

[7]See *Swierupski* v. *Korn* (1979) 69 A.D.2d 632 [419 N.Y.S.2d 87, 91] ("the simplest of competing theories [should] be preferred to the more complex and subtle"); *Allen* v. *United States* (D.Utah 1984) 588 F.Supp. 247, 441, fn. 201 (" '. . . if everything in some science can be interpreted without assuming this or that hypothetical entity, there is no ground for assuming it,' " quoting Bertrand Russell); *Village of Elm Grove* v. *T.V. John & Son* (1992) 173 Wis.2d 170 [496 N.W.2d 167, 169] ("matters must not be multiplied beyond necessity"); *Drake* v. *State* (1982) 248 Ga. 891 [287 S.E.2d 180, 185] (conc. opn. of Weltner, J.) ("essentia non sunt multiplicanda praeter necessitatem"). Perhaps the most robust expression of the rule is the colloquial "Kiss principle," standing for "Keep It Simple, Stupid."

[256 Cal.Rptr. 877] [source of *Seaber* quote]; *Donnell* v. *California Western School of Law* (1988) 200 Cal.App.3d 715, 720 [246 Cal.Rptr. 199] [law school in high-crime area not liable to student injured on adjacent sidewalk]; *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 386 [243 Cal.Rptr. 627] [supermarket did not owe a duty to a customer struck by a motorist on an adjacent public street]; *Southland Corp.* v. *Superior Court* (1988) 203 Cal.App.3d 656, 670 [250 Cal.Rptr. 57] (dis. opn. of Arabian, J.) [". . . one cannot generally be held liable for a dangerous condition of nonowned, nonpossessed or noncontrolled property"]; accord, *Hamilton* v. *Gage Bowl, Inc.* (1992) 6 Cal.App.4th 1706, 1711 [8 Cal.Rptr.2d 819] [owner of bowling alley parking lot not liable to customer injured in lot by a sign which fell from an adjacent building even though the sign was in the parking lot's air space].)

A corollary is that a landowner has no duty to warn of dangers beyond his or her own property when the owner did not *create* those dangers. (*Seaber* v. *Hotel Del Coronado, supra,* 1 Cal.App.4th at pp. 487-488 [hotel was not liable when patron was killed crossing street to reach parking lot frequently used by patrons because unless there is "statutory authority to the contrary, a landowner is under no duty . . . to warn travelers of a dangerous condition not created by him"]; *Balard* v. *Bassman Event Security, Inc.* (1989) 210 Cal.App.3d 243, 250 [258 Cal.Rptr. 343] [nightclub security guard did not have a duty to warn single female customer about a group of inebriated men in nearby parked car who had verbally harassed other patrons]; *A. Teichert & Son, Inc.* v. *Superior Court* (1986) 179 Cal.App.3d 657, 663 [225 Cal.Rptr. 10] [owner of rock and gravel plant owed no duty to a cyclist to post signs warning of frequent truck traffic in and out of plant because accident was not attributable to any specific condition on owner's property].)

Of course, because it is a general rule, there are exceptions. Landowners or businesses have been held liable for injuries not technically on their "premises" when:

—(1) they imposed or created some palpable external effect on the area where the plaintiff was injured; or

—(2) they received a special commercial benefit from the area of the injury plus had direct or de facto control of that area.

Swann has not cited, nor has our own research uncovered, any case which might represent an additional exception to the general rule.

The first exception needs no elaboration. Obviously one cannot leave a banana peel on a public sidewalk and escape liability to the pedestrian who slips on it because one does not own the sidewalk.[8]

The second category is commercial in nature. A review of five of the cases in this category shows that they are predicated on the ideas of "creation" and "control," which can extend beyond the strict perimeters of the area to which one has title or a leasehold interest.

In *Kopfinger* v. *Grand Central Pub. Market* (1964) 60 Cal.2d 852 [37 Cal.Rptr. 65, 389 P.2d 529], "as a result of the manner of operation" at a meat stall in a large central market, a meat deliverer left some gristle on a public sidewalk contiguous to the stall. The stall managers neglected to clean up the mess. In reversing a judgment of nonsuit in favor of the stall operators and against a customer who slid on the gristle, the court specifically noted the hazard was created "in the course" of the defendant's "commercial enterprise." (See 60 Cal.2d at pp. 856.)

In *Johnston* v. *De La Guerra Properties, Inc.* (1946) 28 Cal.2d 394 [170 P.2d 5], the prospective patron of a Mexican restaurant located in a commercial building fell while stepping down from a concrete curb onto a private walkway as she was approaching the side entrance to the building in the dark. The court held that both the restaurant owner (a tenant in the building) and the commercial landlord could be liable for the injuries: the commercial landlord because the patron had been invited to use the walkway leading to the side entrance and there was no adequate lighting or guard rails, the tenant because he had once installed a neon sign which was connected to the single light; the tenant therefore had "limited control" over that portion of the premises. (28 Cal.2d at pp. 400-401.)

In *Ross* v. *Kirby* (1967) 251 Cal.App.2d 267 [59 Cal.Rptr. 601], another restaurant entrance case, a prospective patron fell over a drainage berm located on a private walkway on the way to the back entrance of the restaurant. The berm was a sort of speed bump about two and one-half inches high and four inches wide which, given the downward slope of the adjacent parking lot, kept the rain from coming into the restaurant. The berm was just three feet from the restaurant's door and was partly on the restaurant's property (albeit apparently not at the exact spot where the plaintiff fell), and the paint that had once made it visible had been worn away by the

[8]A subtler application of the idea is that one cannot allow one's own land to spill over—literally—onto another's. (E.g., *Sprecher* v. *Adamson Companies* (1981) 30 Cal.3d 358, 373 [178 Cal.Rptr. 783, 636 P.2d 1121] [owner of 90-acre parcel in Malibu which contained part of an "active landslide" could be held liable for damage to house on downhill property where "effective measures for the control of the slide were within" the owner's "reach"].)

normal foot traffic to the restaurant. Emphasizing the control the restaurant exercised over the entire berm because of the special benefit it derived from the location of the walkway, and following *Kopfinger* and *Johnston*, the *Ross* court held that the question of liability could, under such facts, properly go to the jury. (See 251 Cal.App.2d at pp. 269-271.)

In *Schwartz* v. *Helms Bakery Limited* (1967) 67 Cal.2d 232 [60 Cal.Rptr. 510, 430 P.2d 68], the operator of a doughnut truck told a four-year-old boy to meet him across the street from the boy's house, which was in the middle of a block on a heavily trafficked street in the "gathering dusk" of a winter evening. The driver did not warn the child not to run across the street without looking for cars or offer to help the child cross; when the child found the necessary dime to complete the transaction he darted out from behind a parked car into the path of an oncoming automobile and was struck. (67 Cal.2d at pp. 234-236 & 242.)

The Supreme Court characterized the child as a "business invitee" and therefore concluded that the operator had the duty of exercising reasonable care for the boy "in the immediate vicinity of the truck." (67 Cal.2d at pp. 242-243.) The court focused on the actual location of the injury—a public street—in a footnote. (67 Cal.2d at p. 243, fn. 10.) There the court reasoned that the "dangerous circumstances which caused the injury were created by defendants." Moreover, the concept of "business premises" could be stretched to the street where the child was injured because that street was being used for the doughnut truck's "special benefit." In doing so, however, the court nevertheless stated that an invitor could be liable "if, and only if," the "dangerous condition" giving rise to the injury was "within the invitor's control." (*Ibid.*)[9]

The latest case in this category is *Southland Corp.* v. *Superior Court, supra,* 203 Cal.App.3d 656, 666-667 (maj. opn.). In *Southland*, a convenience store customer was attacked in a vacant, unpaved parking lot next to the store, but the area of the attack was about 10 feet beyond the easterly boundary of the property leased to the store. The court held that a group of seven factors justified the possibility of a jury finding that the store "did exercise a sufficient control over the lot so as to legally permit the imposition of a duty to those customers using the lot." (*Id.* at pp. 666-667.) These

---

[9]As authority for this proposition, *Schwartz* cited *Kopfinger, Johnston* and *Ross*, all discussed above, plus one other case, *Schwerdtfeger* v. *State of California* (1957) 148 Cal.App.2d 335 [306 P.2d 960]. (See *Schwartz, supra,* 67 Cal.2d at p. 243, fn. 10, citing p. 239, fns. 5 & 6.) *Schwerdtfeger* held that the State of California could *not* be liable for injuries sustained by a worker on a pier, which the state *did* own, when an overhanging wire cable fell, carrying with it six suspended canvas tarpaulins, portions of which hit the worker. As there was no evidence that the state possessed "control over the instrumentality that caused the injury," there was no liability. (148 Cal.App.2d at p. 345.)

factors were: the inadequacy of the store's own parking spaces, the regular use of the lot by the store's customers, the store's right, under its lease, to the nonexclusive use of the lot for customer parking, the store owner's awareness of the regular use of the lot by the store's customers, the commercial benefit the store received from the lot, the fact the lot had become a hangout for local juveniles, and the fact the store employees occasionally took action to remove those juveniles. (203 Cal.App.3d at pp. 666-667.)[10]

*Kopfinger, Johnston, Ross, Schwartz and Southland* all arose in commercial contexts, where the defendants received direct pecuniary benefits from the plaintiff's use of the areas where the plaintiffs were injured. Moreover, the defendants either directly created the risk (*Schwartz*) or exercised direct (*Johnston*) or de facto (*Kopfinger, Johnston and Southland*) control over that area.

■ In the present case, by contrast, any thought of "control" over the area of injury is out of the question. The idea that anyone can control the " 'sledge hammering seas' " and " 'inscrutable tides of God' " is debatable, to say the least. (See *Carolina Beach Fish, Pier* v. *Town of Carolina Beach* (1970) 277 N.C. 297 [177 S.E.2d 513, 517], quoting Melville's Moby Dick). The idea that the Cyprus Shore Community Association or Paul and Madeline Olivier can control the ocean adjacent to their land is nothing short of ludicrous. "Even the fabled King Canute with all of his power could not control the water by fiat." (*Queen City Terminals, Inc.* v. *City of Cincinnati* (S.D.Ohio 1987) 666 F.Supp. 1035, 1039, fn. 4.) Because there was no commercial benefit to the defendants, nor creation or control by them of the hazards in the precise area where the injury occurred, we hold defendants owed no duty to warn the plaintiff of the dangerous condition of the ocean beyond their private beach.[11]

---

[10]*Southland* drew a dissent from Justice Arabian, who pointed out that the store owners were being penalized for having attempted in the past to remove the very same sort of juvenile delinquents who had attacked the plaintiff. Did the majority, he asked, "seek to sanction the deafening silence which responded to the cry of Kitty Genovese?" (203 Cal.App.3d at p. 670.)

[11]We also reject the argument that, by recognizing and warning against riptides and pointing out the absence of lifeguards, Cyprus Shore's rules and regulations somehow created a duty to Swann to warn of any dangers *in the water.* Just because one has knowledge of hazards in an area adjacent to one's property does not mean one has a duty to warn of those dangers absent creation of those dangers, control over the area, or derivation of some commercial benefit from it. Otherwise every homeowner whose land bordered a busy street would be under a duty to warn his or her guests of that fact—a ludicrous result.

Nor could Cyprus Shore's *internal* rules and regulations create some sort of "special relationship" between Swann and the owners of the beach, giving rise to a duty to warn of hazards *off the property.* The concept of special relationship "is simply a label expressing the *conclusion* that the facts, considered in light of the pertinent legal considerations, support the

Finally, we must turn our attention to two cases where plaintiffs were successful in at least raising the possibility of recovery for injuries sustained in the surf, *Buchanan* v. *City of Newport Beach* (1975) 50 Cal.App.3d 221 [123 Cal.Rptr. 338] and *Gonzales* v. *City of San Diego* (1982) 130 Cal.App.3d 882 [182 Cal.Rptr. 73]. As the case names indicate, both cases involved suits against *public* entities.

In *Buchanan*, a body surfer was injured because he was thrust down into the sand by a "plunging" wave. The wave plunged because of the joint action of the wave against a man-made jetty together with the general steepness of the surface under the waves[12] which had been created when the jetty was constructed. A nonsuit was granted on the ground that the city could not have any liability in light of Government Code section 831.2, which immunizes public entities for injuries caused by the "natural condition of any unimproved public property." On the date of the accident the "beach" in *Buchanan* was owned by the federal government, and on appeal the court characterized the "true issue" was whether "the evidence would support a finding of control" by the city. (50 Cal.App.3d at pp. 225-226.) The court then reversed the judgment of nonsuit, concluding that the plaintiff had presented evidence to show "inferentially" that the city controlled "the beach." (*Id.* at p. 225.) In particular the court concluded that the city's hiring lifeguards to be stationed at the beach, its posting a sign saying, "No swimming between jetties," its posting another sign stating, "No lifeguard on duty" and its taking "action" on an ordinance to "close the beach to swimmers" was enough to show control. The court did not elaborate on its conclusion other than to cite *Low* v. *City of Sacramento* (1970) 7 Cal.App.3d 826 [87 Cal.Rptr. 173]. (See *Buchanan, supra,* 50 Cal.App.3d at pp. 225-226.)

*Gonzales*, like *Buchanan*, also centered on the immunity of public entities for natural conditions on unimproved public property under Government

---

existence of a *duty* of care." (*Hansra* v. *Superior Court* (1992) 7 Cal.App.4th 630, 646 [9 Cal.Rptr.2d 216], italics added.) We have already shown that landowners *qua landowners* have no *duty* to warn anyone of hazards off their premises unless there exist circumstances not present in this case.

The location of the accident off the premises also disposes of Swann's various arguments that Cyprus Shore's failure to warn him of the dangers in the surf was "willful or malicious," which are keyed into an exception to section 846 immunity. By its terms, section 846 does not limit "the liability which otherwise exists (a) for willful or malicious failure to guard or warn against dangerous condition, use, structure or activity." It is clear from the opening sentence of section 846, however, that any duty to warn which "otherwise exists" refers to dangerous conditions, uses, structures or activities *on the premises.*

[12]The court in *Buchanan* used the words "the steep off-shore condition of the beach" (see 50 Cal.App.3d at p. 225). It is clear from the context that the *Buchanan* court was using the word "beach" to include the surface beneath the water.

Code section 831.2. But unlike *Buchanan,* (which was conspicuously not cited by the *Gonzales* majority), *Gonzales* made no issue of the city's "control."[13]

In *Gonzales* a swimmer had drowned when she was caught in a riptide. The court held that natural dangerousness of the riptides combined with the city's "voluntarily" providing lifeguard service at the beach plus the city's negligent performance of that service created a "partially artificial" dangerous condition which obviated application of Government Code section 831.2 immunity. (See 130 Cal.App.3d at pp. 885-886.)

The injuries in both *Buchanan* and *Gonzales* occurred in publicly owned surf, and involved suits against public entities.[14] Neither case can help Swann here, who is suing private landowners who manifestly do not own the area where he was injured.

Additionally, *Buchanan* cannot be used as support for the idea that the private beach owners here somehow "controlled" the surf by allowing Swann to come onto their (dry) property. The distinction between the sandy strand and the wet surf was never considered by the *Buchanan* court, and the dredging in that case left no doubt that the natural condition of the surf area had been altered, a fact nowhere alleged here. Moreover, *Buchanan's* citation to *Low* as support for its (conclusory) statement that the city "controlled" the surf area demonstrates the basis of its holding was the special statutory obligation imposed on public entities under Government Code section 835. *Low* had held that a county "controlled" a water-filled depression in a parking strip outside a county hospital for purposes of Government Code section 835 because the county undertook to maintain the grassy surface area of the parking strip. (7 Cal.App.3d at p. 834.) The private beach owners here are not subject to Government Code section 835.

---

[13]The court also distinguished between the "beach" and the "surf area." (See 130 Cal.App.3d at p. 884.)

[14]In terms of what it means for public entities, *Gonzales* was most certainly wrong. (See generally, *Rombalski* v. *City of Laguna Beach, supra,* 213 Cal.App.3d at p. 856 (conc. opn. of Crosby, J.). Its rationale makes no sense. Posting lifeguards on a beach does *nothing* to alter the natural condition of the beach or the surf. At most it just invites people to enter the surf. The court confused the idea of inviting people into an area (by posting lifeguards) with the affirmative physical alteration of that area (e.g., by dredging). The case is also vulnerable to the same criticism that Justice Arabian had for the majority opinion in *Southland:* "The majority view has the practical effect of discouraging activities which benefit the victims amongst us." (See *Southland Corp.* v. *Superior Court, supra,* 203 Cal.App.3d at p. 670 (dis. opn. of Arabian, J.).)

The judgment is affirmed.

Moore, J., and Wallin, J., concurred.