**QUEEN CITY TERMINALS, INC.,**
**et al., Plaintiffs,**

**v.**

**CITY OF CINCINNATI, Defendant.**

Civ. No. C–85–1262.

United States District Court,
S.D. Ohio, W.D.

May 13, 1987.

Robert Pitcairn, Jr., Cincinnati, Ohio, for plaintiffs.

James McCarthy, Cincinnati, Ohio, for defendant.

## FINDINGS OF FACT OPINION AND CONCLUSION OF LAW

CARL B. RUBIN, Chief Judge.

This matter is before the Court following trial and the presentation of evidence and testimony. Plaintiffs seek both an injunction against the future enforcement of an ordinance of the City of Cincinnati prohibiting storage of Benzene and other hazardous materials in specific storage facilities, together with damages for the period of time during which such ordinance has been enforced. Pursuant to Rule 52 of the Federal Rule of the Civil Procedure, the Court does submit herewith its Findings of Fact, Opinion and Conclusion of Law.

## I. INTRODUCTION

Like all other cities built on the banks of a river, the City of Cincinnati has long had a concern regarding damage that might result from floods of the Ohio River. The worst flood in Cincinnati history occurred in January of 1937.[1] It is within the memory of a substantial number of persons who lived through that flood. The case at hand is an example of a legislative attempt by the City of Cincinnati to deal with flood related problems. A proper understanding of this case requires an explanation of certain terms:

### A. *River Distances*

Locations along the Ohio River are identified by "mile markers" which indicate the distance from the confluence of the Monongahela and the Allegheny Rivers at Pittsburgh, Pennsylvania. The property of plaintiff is located at mile 465.7. Other property used for similar purposes is located between mile 475 and mile 479.

The City of Cincinnati borders upon the Ohio River for approximately 22 miles. Its boundaries begin at approximately mile 462 and end at approximately mile 484.

### B. *River Depth*

The Ohio River throughout its entire length is controlled by a series of dams which maintain a river depth of 26 feet.

### C. *Floodplain*

A floodplain is the low land in relatively flat areas joining inland waters including, at a minimum, that area subject to a one percent or greater chance of flooding in any given year. It is composed of the following: 1. *Floodway*, that portion of the

---

1. The 1937 flood recorded a water height of 79.99 feet. Flood stage at Cincinnati is 52 feet as indicated by a gauge at the Suspension Bridge in downtown Cincinnati.

floodplain which is effective in carrying flow, within which this carrying capacity must be preserved and where the flood hazard is generally highest ... it is that area which provides for the discharge of the base flood so that the cumulative increase in water surface elevation is no more than one foot; and 2. *The Flood Fringe* which is that portion of the floodplain outside of the floodway. (44 CFR Chapter 1 Federal Emergency Management Agency ¶ 9.4.)

D. *Flood Frequency:*

The likelihood of a flood of a specific size is defined in terms of its frequency over a given period. The term "base flood" refers to a flood which has a one percent chance of being equaled or exceeded in any given year. This is known as a 100 year flood. A flood with a point 0.2 percent frequency is referred to as a 500 year flood. The flood of 1937 is considered to be a 500 year flood.

## II. FINDINGS OF FACT

1. The Plaintiff Queen City Terminal Inc. maintains a facility adjacent to Kellogg Avenue in Cincinnati, at approximately mile 465. Plaintiff operates a public river terminal wherein it receives various liquids for storage and transfer. Such liquids are transferred to and from this facility by river barge, tanker truck or railroad car. Storage tanks on the premises have existed since 1959. The current owner, however, has operated on such premises since 1972.

There are currently located on such premises 17 tanks, 13 of which hold between 400,000 and 4,000,000 gallons of liquid and four which hold approximately 25,000 gallons of liquid. Approximately 95 percent of all liquid is transported to the storage tanks by barge from the Ohio River. Included among the products stored are Caustic Soda, Ethylene Glycol, and Styrene.

2. The Queen City Terminal has operated within the corporate limits of the City of Cincinnati with more than mere acquiescence by the City itself. On two separate occasions official action by the city assisted and expanded the operation. In March, 1982 the City of Cincinnati issued $9,700,000 in industrial revenue bonds for the purpose of financing the construction of storage tanks on plaintiff's property. Permits for eight tanks were issued although only five tanks were actually constructed.

On December 5, 1984, the City of Cincinnati, by ordinance, granted the plaintiff a revocable street privilege to construct a pipeline from a rail-head located on Wilmer Avenue to plaintiff's riverfront terminal. That pipeline required the approval of the City of Cincinnati, since it went under Kellogg Avenue. The pipeline was intended exclusively for the transportation of Benzene from the tank cars to the storage tanks for ultimate transportation to river barges on the Ohio River. On February 21, 1985, the conditional privilege to maintain a pipeline beneath Kellogg Avenue was suspended and on March 20, 1985 was revoked, effectively ending plaintiff's Benzene operation. Benzene is derived from petroleum and is used in various industrial processes. It is no more flammable nor explosive than gasoline. Benzene is not prohibited within the City of Cincinnati. It may be freely transported and stored in any appropriate industrial zone except as prohibited in ordinance 218–1985 (plaintiff's exhibit 44, defendant's exhibit A).

3. On May 1, 1985 the City Council of the City of Cincinnati adopted resolution 218–1985, which prohibited within the "regulatory floodway" more than 1,500 gallons or 15,000 pounds of any material identified as hazardous. That ordinance likewise provided for variances for materials "other than Bezene" ranked as a three hazard according to the NFPA ranking system.[2]

**2.** The NFPA ranking system was originally set up to safeguard firefighters confronted with fires in industrial plants or at storage locations where fire hazards of materials may not be readily apparent. The system identifies the hazards of a material in terms of three principal categories, namely, "health," "flammability," and "reactivity"; and indicates the order of severity by five divisions ranging from "4" indicating a severe hazard, to "0," indicating no special

4. There are other similar storage tanks within the boundaries of the City of Cincinnati that are not affected by ordinance 218–1935. Such tanks are located in the western portion of the City that abuts the Ohio River and specifically at miles 475 through 479. Such tanks are located within the "flood fringe" and not within the regulatory floodway.

5. The base of the plaintiff's tanks are at an elevation of 482 feet above sea-level. The base of the tanks on the western side of Cincinnati are at the same elevation above sea-level.

6. In April of 1982, a flood insurance study was made by the Federal Emergency Management Agency (FEMA) (plaintiff's exhibit 4). Included within this study is Table Three entitled "Floodway Data". Among other things, Table Three determines the "velocity" (feet per second) at various locations on the river. At mile 465 the mean velocity varies between 5.6 and 5.9. From mile 475 to 479 the mean velocity varies from a high of 7.1 at mile 475 to a low of 5.7 at mile 476. There are four other listings which are as follows: 476.5, 6.8; 477, 6.6; 477.5, 6.2; 4.79.5, 6.3. At no point from mile 475 to mile 479 is there a mean velocity as low as that determined for mile 465.[3]

On page 23 the report contains the following "Flood Insurance Zones: after the determination of reaches and their respective FHFs [Flood Hazard Factors], the entire incorporated area of the City of Cincinnati was divided into zones, each *having a specific flood potential or hazard.* Each zone was assigned one of the following flood insurance zone designations." (Emphasis added). The report identified A zones as follows: "Special Flood Hazard Areas inundated by the 100–year flood, determined by detailed methods; base flood elevations are shown, and zones subdivided

according to FHF." Both the property of plaintiff and the property of the storage tanks located in the western portion of the City were placed in zone A21. This determination indicates that the flood hazard was the same at the location of the plaintiff's property in the "Regulatory Floodway" and the location of similar tanks in the "flood fringe" (plaintiff's exhibit 48, 49 and 50).

## III. OPINION

A resolution of this matter requires a consideration of what may appear to be conflicting legal principles. As a threshhold to any analysis there should be eliminated what is not in conflict.

*First:* The power of the City of Cincinnati to adopt regulations concerning the health, safety and welfare of its inhabitants cannot be disputed. Article 18 Section 3 of the Constitution of Ohio provides in part that a "municipality shall have authority to exercise all powers of local self government and to adopt and enforce within their limits such local police ... regulations as are not in conflict with general laws."

*Second:* There can be no doubt that under the "police powers" above enumerated, the City of Cincinnati may lawfully ban from within the City limits, the manufacture, storage or sale of Benzene or any other similar hazardous product.

*Third:* While the City of Cincinnati even under its police power could not prevent barges on the Ohio River from passing the city boundaries loaded with Benzene or other hazardous materials, the City in dealing with a possible flood hazard could make uniform rules regarding the river that would ban such substances from all areas likely to be flooded.

---

hazard. NFPA 704 Standard System for the Identification of the Fire Hazards of Materials.

**3.** The velocity of the river has significance in assessing flood risks since a higher velocity would propel debris against storage tanks with greater force. The estimate of velocity at plaintiff's property varied from a low of 1.5 feet per second as estimated by the Cincinnati engineering firm, Savage Walker, an authority accepted by defendants expert Dr. Prual, to a mean velocity approaching 10 feet per second as estimated by Dr. Prual. The Court can only conclude that variations of this magnitude must indicate a less than precise method of measurement.

■ The foregoing exclusions, however, do not impact upon this matter because they are not dispositive or relevant. The ordinance in question is inherently defective and cannot be sustained by a resort to nonapplicable principles. Ordinance 218–1985 creates distinctions where no such distinctions exist.

■ The power to legislate is not unlimited. Even under the "police power" legislation must involve a rational exercise of such power. The prohibition against a judicial inquiry into the wisdom of a legislative act does not bar an inquiry into the rationality of that act. *Minnesota v. Cloverleaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). This ordinance seeks to differentiate between a "floodway" and a "flood fringe". As a result it bans the storage of certain materials in 17 tanks located on the eastern side of the city, but permits the storage of the identical materials in approximately 200 tanks located on the western side of the city. The distinction between "floodway" and "flood fringe" is an artificial one. Both comprise the "floodplain" as defined herein and both will be equally inundated by water at equal levels. The hazard of flooding does not depend upon an artificial discription[4] but rather upon the quantity of water at a specific depth.

While defendant concedes that the flooding of both the floodway and the flood fringe will occur in equal depths it asserts that there is greater danger in the floodway because the increased velocity of the water therein will impact floating debris with a greater force against the tanks in question. If it is the velocity in the floodway that creates the danger and not just the debris itself, the evidence is clear that the velocity of the water may be at least as great in portions of the flood fringe at it is in the floodway. *See* Finding of Fact 6. Indeed, there is strong evidence that as the river passes the plaintiff's property it is traveling at a lower mean velocity than when it passes property containing similar tanks on the western side of the city.

The defendant has asserted that in order for citizens to qualify for flood insurance it must comply with the FEMA regulations. In reality the defendant has selectively relied on the study when it is favorable and rejected it when it is not. If FEMA establishes the basis for the flood hazards it is relevant to inquire how FEMA dealt with the respective hazards of the property concerned. As pointed out in Finding of Fact 6 FEMA considers the risks to be the same for the property of plaintiff and property similarly used in other portions of the city. A Court comes inescapably to the conclusion that if an insurance inquiry seeking to determine relative hazards finds no difference between two areas it is both illogical and inequittable to draft an ordinance which treats those areas differently.

The evidence is clear that the city has not dealt equally with property which is essentially in the same condition. A failure to do so violates of the 14th Amendment and renders ordinance 218–1985 unconstitutional. The Court expresses no opinion regarding the ability of the City of Cincinnati using its fire code to draft legislation barring the storage of Benzene and other hazardous materials on all property exposed to flooding. A finding of an equal protection violation is dispositive of the ordinance at issue.

### IV. CONCLUSION OF LAW

■ A. The standard of rationality rather than strict scrutiny is to be used in determining whether the ordinance violates the equal protection clause. *Minnesota v. Cloverleaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1980), *Vance Secretary of State v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

■ B. States are accorded wide latitude in the regulation of their local economies under their police powers and rational distinctions may be made with substantially less than mathematical exactitude. *New Orleans v. Dukes*, 427 U.S. 297, 303, 96

---

4. Even the fabled King Canute with all of his power could not control water by fiat.

S.Ct. 2513, 2516–19, 49 L.Ed.2d 511 (1976). However, the equal protection clause prevents government from classifying persons or entities for purposes of regulation if the classification lacks a rational basis and is palpably arbitrary. *Allied Stores v. Bowers*, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959). Moreover, the classification must rest on some ground or difference having a fair and substantial relation to the object of the legislation. *Vance v. Bradley*, 440 U.S. at 110, 99 S.Ct. at 949.

 C. States are not required to convince the Courts of the correctness of their legislative judgments, rather "those challenging the legislative judgment must convince the Court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision maker." *Vance v. Bradley*, 440 U.S. at 111, 99 S.Ct. at 949. Where there was evidence before the legislature reasonably supporting the classification, a litigant may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken. *Minnesota v. Cloverleaf Creamery Co.*, 449 U.S. at 464, 101 S.Ct. at 723–24.

 D. In determining whether a challenge to classification is rationally related to achievement of a legitimate state purpose two questions must be answered: One, does the challenged legislation have a legitimate purpose and two, was it reasonable for the law makers to believe that use of the challenged classification would promote that purpose. *Western & Southern Life Insurance Company v. State Board of Equalization of California*, 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1980).

E. In accordance with the foregoing, Cincinnati Ordinance 218–1985 is hereby declared unconstitutional as violative of the equal protection clause of the 14th Amendment and the City of Cincinnati is hereby permanently enjoined from enforcing such Ordinance.

IT IS SO ORDERED.

Let Judgment Issue in Accordance with the Foregoing.